# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

ANNA Y. SIMS              )

)

       **Plaintiff,**         )

)      **Civil Action No. 3:02-0028**

    **v.**                 )      **Judge Nixon / Knowles**

)

JO ANNE BARNHART,     )

**Commissioner of Social Security**  )

)

      **Defendant.**      )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security which found that Plaintiff was not disabled and which denied Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on cross-Motions for Judgment on the Administrative Record.[1] Docket Entry Nos. 10 and 12.

For the reasons stated below, the undersigned recommends that Plaintiff's "Motion for Judgment on Pleadings or Administrative Record" be DENIED and Defendant's Motion for Judgment on the Administrative Record be GRANTED.

## I. INTRODUCTION

Plaintiff filed her application for Disability Insurance Benefits on February 10, 1999,

---

[1] Plaintiff's Motion is actually entitled "Motion for Judgment on Pleadings or Administrative Record," however, the Court will construe it as a Motion for Judgment on the Administrative Record.

1

alleging that she had been disabled since January 1, 1992, due to "cervical arthrosis, endometriosis, fibromyalgia, break of concentration, pain, insomnia, chronic widespread soft tissue pain, stiffness, chemical imbalances [and] abnormalities in physical function beyond control." *See, e.g.,* Docket Entry No. 8, Attachment ("TR"), pp. 113-115; 124. Plaintiff's application was denied both initially (TR 94-95) and upon reconsideration (TR 96-97). Plaintiff subsequently requested (TR 106) and received (TR 46-93) a hearing. Plaintiff's hearing was conducted on August 31, 2000, by Administrative Law Judge ("ALJ") Raymond Gliva. TR 46. Plaintiff; Vocational Expert, Dr. John Grenfell; and Medical Expert, Dr. Norman Henry, appeared and testified. TR 46-93.

Plaintiff also filed an application for Supplemental Security Income ("SSI") benefits on February 10, 1999, and was awarded SSI benefits based upon a finding of disability since April 19, 1999. TR 22. Plaintiff was found to be disabled as of October 1, 1998, as a result of mental limitations. TR 25. Plaintiff was insured for disability benefits through September 30, 1997.[2] TR 23. Plaintiff must establish disability on, or prior to, this date. *See* 20 C.F.R. § 404.131; 42 U.S.C. §§ 423 (a) and (d). *See also* TR 23.

On September 19, 2000, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations at any time prior to the expiration of her DLI. TR 19-28. Specifically, the ALJ made the following findings of fact:

> 1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is

_____

[2] September 30, 1997 is therefore Plaintiff's date last insured ("DLI").

Case 3:02-cv-00028   Document 17   Filed 04/13/06   Page 2 of 49 PageID #: 2

insured for benefits through September 30, 1997.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's myofascial pain was a severe impairment on September 30, 1997, based upon the requirements in the Regulations (20 CFR § 404.1521).

4. This medically determinable impairment did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations prior to her date last insured are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment (20 CFR § 404.1527).

7. The claimant had the residual functional capacity for light exertional level work with no severe mental limitations as is fully set out in the body of this decision.

8. The claimant's past relevant work as a child development center teacher, and a factory worker did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

9. The claimant's medically determinable myofascial pain did not prevent the claimant from performing her past relevant work.

10. The claimant was not under a "disability" as defined in the Social Security Act, at any time prior to the expiration of her date last insured on September 30, 1997 (20 CFR § 404.1520(e)).

TR 27.

On September 28, 2000, Plaintiff timely filed a request for review of the hearing

decision. TR 18. On December 6, 2001, the Appeals Council issued a letter declining to review

3

the case (TR 7-8), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to "cervical arthrosis, endometriosis, fibromyalgia, break of concentration, pain, insomnia, chronic widespread soft tissue pain, stiffness, chemical imbalances, and abnormalities in physical function beyond control." TR 124.

A 1988 record indicated that Plaintiff reported having "recurrence of depression/ anxiety," and reported that Plaintiff had "poor impulse control."[3] TR 451.

On March 18, 1991, Plaintiff visited the United States Army Health Clinic and requested medication for her "nerves." TR 257. The physician noted that Plaintiff had "mild anxiety" and prescribed her Atarax 25 milligrams. *Id.*

On September 29, 1994, Geoffrey Sherrill, MAJ, MC, FS, commented on results of Plaintiff's bloodwork and x-rays conducted on September 14, 1994.[4] TR 239. Dr. Sherrill prescribed Tylox. *Id.*

On October 6, 1994, Dr. Sherrill completed a "Referral for Civilian Medical Care," requesting that Plaintiff be evaluated for chronic bilateral shoulder pain and rheumatoid arthritis.

---

[3] There is no indication as to the identity of the examining physician, and the exact date of this record is unascertainable.

[4] This record is partially illegible.

4

TR 238.

On October 27, 1995, Dr. Norman A. Scarborough examined Plaintiff and noted that "[r]outine views" of Plaintiff's right and left shoulders demonstrated "no evidence of inflammatory, neoplastic or arthritic change," and that there was "no evidence of fracture." TR 470. Dr. Scarborough's impression of Plaintiff was "normal" right and left shoulders. *Id.*

On September 4, 1996, Plaintiff was examined by Captain Vincent Battista. TR 228-229. Captain Battista noted that Plaintiff complained of "extreme bilateral shoulder pain," and he gave Plaintiff an injection upon her request. TR 229.

On January 29, 1997, Plaintiff was examined by Dr. Jolene J. Shuman for complaints of shoulder pain and spasms in her shoulder blades. TR 458. Dr. Shuman noted that Plaintiff reported having "shoulder pain since 1990," that Plaintiff had visited a chiropractor for a "strained muscle," and that she had received steroid injections at Vanderbilt University Medical Center. *Id.*

On January 31, 1997, Plaintiff was examined by Dr. Anthony C. Bare for complaints of shoulder pain that was aggravated by lifting.[5] TR 457. Dr. Bare noted that Plaintiff was examined at Vanderbilt University Medical Center and was given injections for her shoulders which provided "some relief." *Id.*

On March 3, 1997, Dr. Bare examined Plaintiff and noted that Plaintiff's pain remained "largely unchanged," and that Plaintiff believed that her "motion [had] improved." TR 467.

On March 28, 1997, Plaintiff was examined by Dr. Rex A. Blunck for complaints of chronic neck and shoulder pain. TR 220. Dr. Blunck noted that Plaintiff had "mild grip

_____

[5] The handwritten notation is partially illegible.

Case 3:02-cv-00028   Document 17   Filed 04/13/06   Page 5 of 49 PageID #: 5

strength" and "good strength of arms and hands." *Id.* Dr. Blunck recommended that Plaintiff "continue rest [*sic*]." *Id.*

On April 8, 1997, Dr. Blunck noted that Plaintiff reported having upper back, shoulder, and arm pain. TR 463. Dr. Blunck noted that Plaintiff should consider "cervical steroids."[6] *Id.*

On July 1, 1997, Ms. Kitty Stephens, N.P., examined Plaintiff and noted that Plaintiff was "neurologically intact." TR 473. Ms. Stephens' impression was "cervical arthrosis which has responded well to cortisone injection." *Id.*

On October 7, 1997, Plaintiff was examined by John C. Cheasty, MPH, PA-C, for complaints of myofacial pain.[7] TR 219. Mr. Cheasty refilled Plaintiff's prescription. *Id.*

On August 21, 1997, Plaintiff was examined by Dr. Schoette[8] for complaints of pain and spasms in her neck, back, shoulders, and upper arms. TR 200. Dr. Schoette noted that Plaintiff had been treated by a chiropractor, that Plaintiff had received "TP" injections in March 1997, and that Plaintiff had tried a "TENS Unit," none of which improved her condition. *Id.* Plaintiff reported that "prolonged standing" increased her symptoms and that "bed-rest" decreased her symptoms. *Id.* Dr. Schoette also noted that Plaintiff had a family history of arthritis and tremors in arms and hands. *Id.*

On August 22, 1997, Plaintiff visited Dr. Susan Jacobi, complaining of neck and shoulder pain. TR 202. Dr. Jacobi noted that Plaintiff was "distraught," and that much of Plaintiff's medical history had to be obtained from her husband. *Id.* Dr. Jacobi noted that Plaintiff reported

_____

[6] This record contains other recommendations that are illegible.

[7] The record is partially illegible.

[8] The record does not indicate Dr. Schoette's first name.

that her episodes of shoulder pain would last "months at a time," and that Plaintiff had never been told that she had any type of "systemic type arthritis." *Id.* Dr. Jacobi also noted that Plaintiff reported having had some problems with fatigue and depression the previous year, but that she began to "feel better about herself" after losing weight and exercising more. *Id.* Dr. Jacobi noted that Plaintiff had consulted a chiropractor and had since been having "excessive muscular pain and muscle spasms" from her upper back and into her neck. *Id.* Dr. Jacobi noted that Plaintiff had consulted Dr. Salyers, her orthopedist, who noted that Plaintiff had a "facet arthrosis." *Id.* Dr. Jacobi noted that Plaintiff had gone to physical therapy and had had traction, but that Plaintiff stated that it only made her "feel worse." *Id.* Dr. Jacobi noted that Plaintiff had seen six to eight doctors, was anxious, depressed, and stressed, and could not sleep, and that she reported having fatigue and some morning stiffness. TR 203.

Dr. Jacobi noted that Plaintiff had "chronic neck and shoulder pain," that the etiology had not been identified, and that Plaintiff had a "very strong component of depression and anxiety." TR 204. Dr. Jacobi opined that Plaintiff should see a psychologist, continue with her exercise program, and continue taking Naprosyn. TR 205.

On September 22, 1997, Dr. Brian R. Swenson noted that Plaintiff telephoned his office stating that she was having a panic attack and that she did not have any Xanax to take. TR 207. Dr. Swenson noted that Plaintiff would start on Zoloft and that Plaintiff denied "any suicidal or homicidal ideation." *Id.*

In a handwritten notation dated October 1, 1997, Dr. Swenson indicated that Plaintiff telephoned his office to report that she was "sleeping well" and that she was "very pleased." TR 207.

7

On October 28, 1997, Plaintiff was examined by Dr. Swenson who noted that Plaintiff was "clearly better." TR 324.

In a letter dated October 29, 1997, Dr. Swenson reported to Dr. Jacobi that Plaintiff had made "outstanding progress." TR 206. Dr. Swenson noted that Plaintiff had experienced symptoms that were consistent with Panic Disorder. *Id.* Dr. Swenson reported that Plaintiff had "done beautifully" on a "low" dose of Zoloft and has had a "marked reduction in panic attack symptoms." *Id.* Dr. Swenson further reported that Zoloft had helped Plaintiff psychiatrically and that she was seeing a psychologist for therapy. *Id.*

On December 2, 1997, Plaintiff was examined by Dr. Swenson, who noted that Plaintiff was "doing great." TR 324.

On December 13, 1997, Plaintiff was again examined by Mr. Cheasty. TR 464. Mr. Cheasty noted that Plaintiff reported experiencing mood swings, loss of hair, and depression since taking her medication.[9] *Id.*

On January 20, 1998, Plaintiff was examined by Dr. Swenson, who noted that Plaintiff was "doing well." TR 324.

On August 10, 1998, Plaintiff visited Dr. Richard D. Larson at Baptist Care. TR 300. Dr. Larson noted that Plaintiff had "fibromyalgia," and that she complained of pain "in her back, across her shoulders, up her neck, and down along her spine." *Id.* Dr. Larson reported that "B12" injections and physical therapy had previously helped relieve Plaintiff's pain. *Id.* Dr. Larson noted that Plaintiff had "some amenorrhea," and that she was "alert and oriented in NAD." *Id.* Dr. Larson ordered physical therapy, a heat massage, an ultrasound, and a "TENS

---

[9] Mr. Cheasty did not record the specific name of the medication mentioned, and the remainder of the record is illegible.

Unit" to the posterior shoulder, neck, dorsal, and lumbar paravertebral areas. *Id.*

On August 24, 1998, Plaintiff returned to Dr. Larson for a complete examination. TR 299. Dr. Larson noted that Zoloft had helped Plaintiff's depression, and that Plaintiff's depression was "under control." *Id.* Dr. Larson scheduled sinus x-rays and a pelvic ultrasound; he did not prescribe Plaintiff any new medication. *Id.* In a progress note dated September 4, 1998, Dr. Larson reported that Plaintiff was "doing pretty well" and "feeling much better." TR 295.

On September 23, 1998, Plaintiff underwent a lumbar spine series which revealed "minimal osteophyte formation"; "no evidence of fracture subluxation, or lytic skeletal lesion"; and "no indication of a significant degenerative process." TR 296.

In a progress note dated September 23, 1998, Dr. Larson reported that Plaintiff had "lower back pain." TR 292. Dr. Larson reported that Plaintiff's vital signs were normal, but that she had "tenderness" in her "lumbar sacral area equally bilaterally"; in her "upper trapezii in her dorsal and lumbar paravertebral muscles"; in her shoulders; and "some tenderness" and "stiffness" in her "MP joints and proximal IP joints of the fingers." *Id.* Dr. Larson noted that Plaintiff's "big problem" was fibromyalgia, but that she also experienced sinus congestion and depression. *Id.*          .

On October 26, 1998, Plaintiff returned to Baptist Care and was examined by Dr. Ramsey G. Larson for a "bad sinus infection." TR 291. The hospital record indicated that Plaintiff's depression was "mostly well-controlled" on Zoloft and that she had "no exacerbations of her fibromyalgia." *Id.*

On November 10, 1998, Plaintiff visited Dr. Richard Larson for evaluation of a cyst on her left ovary. TR 310. Plaintiff complained that she had "pain with radiation and discomfort to

9

her back bilaterally." *Id.* Plaintiff described the pain as being "a constant aching pain" like she was "in labor." *Id.* Dr. Larson discussed the risks and benefits of surgery with Plaintiff. *Id.* On November 10, 1998, Plaintiff underwent a "[d]iagnostic laparoscopy with C02 laser vaporization and pelvic endometriosis and laparoscopic adhesiolysis and laparoscopic tubal sterilization."[10] TR 314.

On December 1, 1998, Plaintiff visited Dr. Curtis J. Elam for a postoperative evaluation. TR 316. Dr. Elam noted that Plaintiff reported experiencing "lower back pain," but that it was "not as bad as it was in the past." *Id.* Dr. Elam discussed various treatment options with Plaintiff. *Id.*

Plaintiff visited Dr. Robert Gronewald for general healthcare complaints from January 5, 1999 through June 29, 1999. TR 376-384.

In a letter dated March 6, 1999, Dr. Salvatore A. Zingale summarized his clinical contacts with Plaintiff. TR 325. Dr. Zingale reported that he had seen Plaintiff for 15 sessions between September 11, 1997 and May 14, 1998. *Id.* Dr. Zingale noted that Plaintiff had sought treatment because she had experienced "moderate to severe pain in her neck and shoulder area (which was exacerbated by physical activity), frequent panic attacks, and depressed mood with insomnia, decreased energy level, increased appetite, irritability, decreased libido, anhedonia, and significantly decreased concentration and memory." *Id.* Dr. Zangale diagnosed Plaintiff with: "Panic Disorder without Agoraphobia"; "Depressive Disorder NOS"; and "Pain Disorder Associated with Psychological Factors." *Id.* Dr. Zangale reported that Plaintiff's treatment was "terminated prematurely" when she moved away. *Id.*

---

[10] A detailed account of the procedure is available in the record. TR 314-315.

On March 12, 1999, Examiner Robin Roberts and Dr. Patricia Maffeo conducted a psychological evaluation of Plaintiff. TR 326. Dr. Maffeo noted that Plaintiff had arrived 10 minutes early for her evaluation and appeared to be "anxious and depressed." *Id.* Dr. Maffeo noted that Plaintiff was "tearful at one point and seemed to attempt to pull for sympathy." *Id.* Dr. Maffeo also noted that Plaintiff was "mildly dramatic and tended to be focused on her physical symptoms." *Id.* Dr. Maffeo noted that Plaintiff's speech was "circumstantial and somewhat unclear," and that Plaintiff "did not give a full report of her problems." *Id.* Dr. Maffeo recorded Plaintiff's stated problems regarding her fibromyalgia, panic attacks, mood swings, and depression. TR 327. Dr. Maffeo also documented Plaintiff's personal background, employment history, and activities of daily living. TR 328-329.

Dr. Maffeo noted that Plaintiff's activities of daily living included driving a car, fixing her daughter breakfast, occasionally going to her daughter's school for functions and to help read stories, going grocery shopping, sweeping the hall and porch once a week, washing the dishes, doing laundry, managing her money, keeping in touch with old friends, and going to church to meet new friends. TR 329.

Plaintiff was administered the "WAIS-II," the results of which revealed that Plaintiff's Verbal I.Q. score fell at the "low end of the Low-Average Range of intelligence"; that her "Performance and Full Scale" I.Q. scores fell within the "Borderline Range"; and that her "Verbal and Performance" I.Q. scores were "not significantly different." TR 329. Dr. Maffeo noted that Plaintiff's "best performances" measured "attention and concentration and attention to visual detail." *Id.* Plaintiff's "poorest performances" measured "nonverbal abstract reasoning and processing of letters and numbers in memory." *Id.* Dr. Maffeo commented that Plaintiff's performance during the examination may have been "disrupted by emotional problems." *Id.* Dr.

11

Maffeo also reported that Plaintiff "seemed" to have tried "her best on the test," and opined that her scores were a "valid indication of her intellectual ability." *Id.*

Plaintiff was also administered the "Rorschach," the results of which revealed that "some of [Plaintiff's] decisions and behaviors [were] likely to be poorly thought out or implemented." TR 330. Dr. Maffeo noted that Plaintiff appeared to be "highly anxious" and that she "sometimes engage[d] in painful, irrational self-focus." *Id.* Dr. Maffeo noted that Plaintiff "often retreat[ed] into fantasy as a routine tactic for dealing with problem situations" which "may lead to dependency on others and avoidance of decision-making." *Id.* Dr. Maffeo noted that Plaintiff scored at the "critical level" on the "coping deficit index," indicating that she was prone to "functional disorganization under stress." *Id.* Dr. Maffeo further noted that Plaintiff had a "low self-esteem" and "probably" saw herself as "damaged." *Id.*

Dr. Maffeo also assessed Plaintiff's Ability to do Work-Related Activities, and noted that Plaintiff could "understand and remember simple work-like activities." TR 331. Dr. Maffeo further noted that Plaintiff's "[a]ttention and concentration appear[ed] to be intact for simple functions but appear[ed] impaired when processing and memory [were] involved." *Id.* Dr. Maffeo noted that Plaintiff "[m]ay not be able to maintain pace," and was "[l]ikely to become disorganized by stress." *Id.* Dr. Maffeo noted that Plaintiff also appeared "emotional and unfocused," and opined that this "could interfere with interpersonal relations." *Id.* Dr. Maffeo commented that Plaintiff's "[i]mpaired concentration could limit [her] awareness of hazards." *Id.* Dr. Maffeo noted that Plaintiff was able to drive, but "[p]robably could not arrive at an unfamiliar destination unaccompanied." *Id.* Dr. Maffeo finally noted that Plaintiff "[c]ould make plans independent of others." *Id.*

In a letter dated March 9, 1999, Dr. Stephen C. Rutledge noted that he had met with

12

Plaintiff for 12 sessions, the first of which was on August 12, 1998. TR 333. Dr. Rutledge noted that Plaintiff had complained of "depression, anxiety, and physical problems that seem to affect the quality of her social relationships." *Id.* Dr. Rutledge noted that Plaintiff was "often dysthymic, confused, and tearful." *Id.* Dr. Rutledge further noted that Plaintiff "certainly" had the capacity to understand verbal and written instructions, but that her memory and concentration were "significantly" impaired. *Id.* Dr. Rutledge noted that Plaintiff appeared "anxious" and "rather easily upset which would consequently affect the fluctuation of her work product." *Id.* Dr. Rutledge also noted that Plaintiff did not "adapt particularly well to short term and quick response time changes." TR 333-334. Dr. Rutledge believed that Plaintiff was at a "significant disadvantage" in the social context. TR 334.

Dr. Rutledge's working diagnosis of Plaintiff was that she had "Dysthymic Disorder." TR 334. A secondary diagnosis was that Plaintiff had "Anxiety Disorder Not Otherwise Specified." *Id.* Dr. Rutledge opined that Plaintiff's "level of functioning" was "about 55 on a scale of 0-100," and further opined that her "highest level of functioning over the past year" was "no more than 60 on that same scale." *Id.*

On March 18, 1999, a DDS physician completed a Psychiatric Review Technique Form regarding Plaintiff.[11] TR 335. The physician indicated that Plaintiff had the "Affective Disorders" of "depressive syndrome"; "appetite disturbance with change in weight"; "sleep disturbance"; "decreased energy"; and "difficulty concentrating or thinking." TR 338.

Under the category of "Mental Retardation and Autism," the physician indicated that Plaintiff had "[s]ignificantly subaverage general intellectual functioning with deficits in adaptive

---

[11] The physician's name and handwritten notes are illegible.

13

behavior initially manifested during the developmental period (before age 22), or pervasive developmental disorder characterized by social and significant communicative deficits originating in the developmental period, as evidenced by [...] 'BIF.'" TR 339.

With regard to "Anxiety Related Disorders," the physician indicated that Plaintiff had "anxiety as the predominate disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by 'anxiety p/o NOS.'" TR 339. The physician further indicated that Plaintiff had "[n]o evidence of a sign or symptom cluster or syndrome" of either a somatoform disorder or a personality disorder. TR 340. The physician also reported that Plaintiff did not have any substance addiction disorders. TR 341.

The physician noted that Plaintiff had a "moderate" limitation regarding "difficulties maintaining social functioning," and that she "often" experienced "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner." TR 342. The physician noted that Plaintiff "once or twice" experienced "episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms," and that she experienced "slight restriction of activities of daily living." *Id.*

On March 18, 1999, Dr. Tom Neilson partially completed a Psychiatric Review Technique Form regarding Plaintiff. TR 344. The only indication made by Dr. Neilson was that there was insufficient medical evidence to arrive at a medical disposition. *Id.*

On March 18, 1999, Dr. Tom Neilson also completed a Mental Residual Functional Capacity Assessment regarding Plaintiff. TR 353. Dr. Neilson noted that Plaintiff was "moderately" limited with regard to her "ability to understand and remember detailed instructions"; her "ability to carry out detailed instructions"; her "ability to maintain attention

14

and concentration for extended periods"; her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; her "ability to interact appropriately with the general public"; her "ability to accept instructions and respond appropriately to criticism from supervisors"; her "ability to respond appropriately to changes in the work setting"; and her "ability to set realistic goals or make plans independently of others." TR 353-354. Dr. Neilson noted that Plaintiff was "not significantly limited" regarding her "ability to remember locations and work-like procedures"; her "ability to understand and remember very short and simple instructions"; her "ability to carry out very short and simple instructions"; her "ability to sustain an ordinary routine without special supervision"; her "ability to work in coordination with or proximity to others without being distracted by them"; her "ability to make simple work related decisions"; her "ability to ask simple questions or request assistance"; her "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes"; her "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness"; her "ability to be aware of normal hazards and take appropriate precautions"; and her "ability to travel in unfamiliar places or use public transportation." *Id.*

On April 14, 1999, Dr. Jeffrey Summers examined Plaintiff and noted that his impression was "fibromyalgia." TR 374. Dr. Summers opined that it was "reasonable to expect that sustained physical activity for more than 6 hours continuously would be difficult for [Plaintiff] to perform" because of her underlying fibromyalgia. TR 375. He further opined that Plaintiff should be able to tolerate most other activities with "minimal" difficulty. *Id.*

15

On April 6, 1999,[12] Dr. Lawrence Scarill completed a Residual Physical Functional Capacity Assessment regarding Plaintiff.[13] TR 357. In this Assessment, Dr. Scarill opined that Plaintiff could "occasionally" lift and/or carry 20 pounds, and "frequently" lift and/or carry 10 pounds. TR 358. Dr. Scarill also opined that Plaintiff could stand and/or walk "less than 2 hours in an 8-hour workday," and could sit for "about 6 hours in an 8-hour workday." *Id.* Dr. Scarill noted that Plaintiff's ability to push or pull was "unlimited." *Id.* Dr. Scarill opined that Plaintiff was "never" limited in her "climbing" ability, and was "occasionally" limited in her balancing, stooping, kneeling, crouching, and crawling abilities. TR 359. Dr. Scarill further noted that Plaintiff did not have any manipulative, visual, communicative, or environmental limitations. TR 360-361.

Also on April 6, 1999,[14] Dr. Scarill completed a second Residual Physical Functional Capacity Assessment of Plaintiff.[15] TR 365. Dr. Scarill again opined that Plaintiff could "occasionally" lift and/or carry 20 pounds, "frequently" lift and/or carry 10 pounds, and sit for "about 6 hours in an 8-hour workday." TR 366. He again noted that Plaintiff was "unlimited" in her ability to push or pull, and that Plaintiff did not have any manipulative, visual, communicative, or environmental limitations. TR 366; 368-369. Although completed on the same date as his initial Residual Physical Functional Capacity Assessment of Plaintiff, Dr.

---

[12] The initial page of the Assessment and the Table of Exhibits note the date of Assessment as April 6, 1999; the date next to Dr. Scarill's signature, however, appears to be April 16, 1999.

[13] Dr. Scarill's handwritten comments are illegible.

[14] As has been noted, the initial page of the Assessment and the Table of Exhibits note the date of Assessment as April 6, 1999, but the date next to Dr. Scarill's signature appears to be April 16, 1999.

[15] Dr. Scarill's handwritten comments are illegible.

16

Scarill opined in his second Residual Physical Functional Capacity Assessment that Plaintiff could stand and/or walk "about 6 hours in an 8-hour workday," and that Plaintiff was "frequently" limited regarding her climbing, balancing, stooping, kneeling, crouching, and crawling abilities. TR 366-367.

On July 9, 1999, Dr. Frank Edwards completed a Psychiatric Review Technique Form regarding Plaintiff. TR 385. Dr. Edwards indicated that there was "insufficient medical evidence" to arrive at a medical disposition, but noted that Plaintiff experienced "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidence by 'NOS.'" TR 385; 388. Dr. Edwards reported that Plaintiff experienced "[a]nxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by Panic D/O," and that there was "no evidence" of mental retardation or autism, somatoform disorders, or personality disorders. TR 389; 390-391. With regard to Plaintiff's "Rating of Impairment Severity," Dr. Edwards indicated that there was "insufficient evidence" to assess the degree of limitation for all of the listed categories. TR 392.

On July 13, 1999, Dr. H.T. Lavely, Jr. completed a Residual Physical Functional Capacity Assessment regarding Plaintiff. TR 394. Dr. Lavely opined that Plaintiff could "occasionally" lift and/or carry 20 pounds, and "frequently" lift and/or carry 10 pounds. TR 395. Dr. Lavely further opined that Plaintiff could stand and/or walk for "about 6 hours in an 8-hour workday," and sit for "about 6 hours in an 8-hour workday." *Id.* Dr. Lavely noted that Plaintiff's ability to push and/or pull was "unlimited,"[16] but that she was "frequently" limited in all postural activities such as climbing, balancing, stooping, kneeling, crouching, and crawling.

---

[16] Dr. Lavely made additional handwritten comments in the record, however, they are illegible.

17

TR 395-396. Dr. Lavely reported that Plaintiff did not have any manipulative, visual, communicative, or environmental limitations. TR 397-398.

In a letter dated September 7, 1999, Dr. Jeffrey Scheib noted that he saw Plaintiff on September 2, 1999, and that "her chief complaint [was] fibromyalgia." TR 402. Dr. Scheib's impressions of Plaintiff were "generalized hyperalgesia with no objective abnormalities noted" and "right sacral tenderness-R/O sacroiliitis (doubt)." TR 403.

On March 28, 2000, Dr. Jerry Holland performed a psychological evaluation of Plaintiff. TR 412. Dr. Holland noted that Plaintiff was "alert and oriented," that she "made good eye contact," and that she "was pleasant and cooperative." TR 413. Dr. Holland also noted that his office staff reported that Plaintiff was "quite irritable, easily set off by noises, including what appeared to be rather sedate serene music." *Id.* Dr. Holland noted that Plaintiff was "psychomotor agitated," and cried on occasion during the interview, but denied any suicidal tendencies. *Id.* Dr. Holland further noted that there was "no evidence of ongoing psychosis," and commented that the "remainder of her mental status examination was primarily significant for poor concentration." *Id.* Dr. Holland's assessment of Plaintiff was that she had "Post Traumatic Stress Disorder, delayed onset"; "Major Depressive Disorder"; "Generalized Anxiety Disorder"; and "[p]ossible agoraphobia with panic attacks." *Id.* Dr. Holland noted that Plaintiff's stressors were "chronic pain and medical illness." TR 414. Dr. Holland noted that, because higher doses of Zoloft had been ineffective, he would substitute this medication with Effexor XR and a low dose of Ativan. *Id.*

In a progress note dated April 12, 2000, Dr. Holland reported that Plaintiff was "doing much better since Effexor XR was substituted for Zoloft and she is starting process of psychotherapy with good initial rapport established." TR 431.

18

In a progress note dated June 6, 2000, Dr. Holland noted that Plaintiff had continued to "have problems with hyperacusis." TR 418. Dr. Holland further reported that when Plaintiff heard her daughter cry, Plaintiff's past traumatic memories were triggered. *Id.* He noted that Plaintiff was to resume psychotherapy. *Id.*

On June 29, 2000, Dr. Thomas Baker completed a "Medical Assessment of Ability to do Work-Related Activities" form regarding Plaintiff. TR 415. Dr. Baker noted that Plaintiff could "occasionally" lift and/or carry 25 pounds and "frequently" lift and/or carry 10 pounds. *Id.* Dr. Baker noted that Plaintiff could sit and stand and/or walk without interruption for 5 minutes in an 8-hour workday. *Id.* Dr. Baker noted that Plaintiff could "never" perform postural activities such as climbing, balancing, stooping, crouching, kneeling, crawling. TR 416. Dr. Baker noted that Plaintiff's physical impairment affected her physical functions such as reaching, handling, and pushing or pulling, but that she did not have any environmental restrictions. *Id.*

In a progress note dated July 11, 2000, Dr. Holland reported that Plaintiff had been doing "reasonably well" since her previous examination. TR 430. He noted that Plaintiff was expected to get a new primary care physician within the next month because her then-current primary care physician "did not feel comfortable prescribing for her fibromyalgia syndrome." *Id.* Dr. Holland noted that Plaintiff's Post Traumatic Stress Syndrome symptoms were "improving." *Id.* Dr. Holland stated that Plaintiff's sleep impairments might be "affecting her residual symptoms and pain." *Id.*

On July 20, 2000, Dr. Rutledge completed a "Medical Assessment of Ability to do Work Related Activities (Mental)" form. TR 420. Dr. Rutledge indicated that Plaintiff did not have any limitations regarding her ability to "follow work rules," but that she had "slight" limitations regarding her abilities to "relate to co-workers"; to "deal with the public"; to "use judgement";

19

and to "function independently." *Id.* Dr. Rutledge indicated that Plaintiff had "moderate" limitations regarding her abilities to "interact with a supervisor," and to "maintain attention/concentration," and that she had a "marked" limitation regarding her ability to "deal with work stresses." *Id.*

Dr. Rutledge noted that Plaintiff had "slight" limitations regarding her abilities to "understand, remember, and carry out complex job instructions," and to "understand, remember and carry out detailed, but not complex, job instructions." TR 421. Dr. Rutledge further noted that Plaintiff did not have any limitations regarding her ability to "understand, remember and carry out simple job instructions." *Id.*

Dr. Rutledge noted that Plaintiff had "moderate" limitations regarding her abilities to "behave in an emotionally stable manner"; to "relate predictably in social situations"; and to "demonstrate reliability." TR 421. Dr. Rutledge further noted that Plaintiff was not able to manage benefits in her own best interest. TR 422.

On July 20, 2000, Ms. Teresa Davis, LCSW, completed a "Medical Assessment of Ability to do Work-Related Activities (Mental)" form. TR 424. Ms. Davis noted that Plaintiff had "extreme" limitations regarding her abilities to "deal with the public" and to "deal with work stresses." *Id.* Ms. Davis further noted that Plaintiff had "marked" limitations regarding her abilities to "function independently," and to "maintain attention/concentration." *Id.* Ms. Davis noted that Plaintiff had "moderate" limitations regarding her abilities to "relate to co-workers"; to "use judgment"; and to "interact with supervisor." *Id.* Ms. Davis also noted that Plaintiff had a "slight" limitation regarding her ability to "follow work rules." *Id.*

Ms. Davis noted that Plaintiff had "extreme" limitations regarding her abilities to "understand, remember and carry out complex job instructions," and to "understand, remember

20

and carry out detailed, but not complex, job instructions." TR 425. Ms. Davis noted that Plaintiff had a "marked" limitation regarding her ability to "understand, remember and carry out simple job instructions." *Id.*

Ms. Davis also indicated that Plaintiff had "marked" limitations regarding her abilities to "behave in an emotionally stable manner"; to "relate predictably in social situations"; and to "demonstrate reliability." TR 425. Ms. Davis noted that Plaintiff had a "slight" limitation regarding her ability to "maintain personal appearance." *Id.* Ms. Davis indicated that Plaintiff was able to manage her benefits in her own best interest. TR 426.

In a progress note dated August 9, 2000, Dr. Holland reported that Plaintiff had "some increased panic type anxiety recently with only modest relief from current Ativan." TR 429. Dr. Holland opined that Plaintiff's anxiety "seem[ed] to have been set off by recurrent preoccupations" about her husband's military involvement, and he noted that Plaintiff acknowledged "continued psychotherapy around these issues." *Id.* Dr. Holland recommended marital counseling and increased Plaintiff's dosages of her medication. *Id.*

A Radiologic Examination Report conducted on September 8, 2000, indicated that Plaintiff's cervical pain and a previous MRI revealed "degenerative disease with narrowing of foramina." TR 442. The reported impressions were "[m]ultilevel facet arthropathy which [did] not significantly compromise the neural foramina based on this examination," and "degenerative disc disease at L3-4 and L4-5 without focal disc herniation." TR 445.

In a letter dated September 25, 2000, Dr. Holland stated that he first saw Plaintiff on March 28, 2000, and that she was diagnosed with "major depressive disorder, generalized anxiety disorder, and panic attacks with possible agoraphobia." TR 440. He noted that Plaintiff's "complex combination of psychiatric conditions [was] clearly disabling her from any

21

meaningful employment with diminished ability especially to deal with the public due to work stressors." *Id.* Dr. Holland also noted that Plaintiff's psychiatric conditions affected her abilities to function independently and to "maintain a constant attention and concentration making any occupational adjustment impossible." *Id.* Dr. Holland opined, "There is no doubt in my mind that her disabling psychiatric condition goes back at least to 1996 and probably back somewhat further." *Id.*

On November 13, 2000, Dr. Michael L. Beyant completed a "Medical Assessment of Ability to do Work-Related Activities" form regarding Plaintiff. TR 435. Dr. Beyant noted that Plaintiff could "occasionally" lift and/or carry 3 to 5 pounds.[17] *Id.* Dr. Beyant noted that Plaintiff could stand and/or walk for 2 hours, for 10-15 minutes without interruption, in an 8-hour workday, and that Plaintiff could sit for 2 hours, for 15 minutes without interruption, in an 8-hour workday. *Id.* Dr. Beyant noted Plaintiff's lower back and cervical pain as support for his findings. *Id.* Dr. Beyant also noted that Plaintiff's pain while sitting could be minimized with correct lumbar support. *Id.*

Dr. Beyant opined that Plaintiff could "occasionally" perform postural activities such as climbing, balancing, stooping, crouching, kneeling, and crawling. TR 437. Dr. Beyant noted that Plaintiff's impairment affected physical functions such as "reaching, handling, feeling, pushing/pulling, seeing, hearing, and speaking," and that Plaintiff had environmental restrictions such as restrictions to heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, and vibration. *Id.* To support his findings, Dr. Beyant noted Plaintiff's complaints of pain, and her history of panic attacks. *Id.* Dr. Beyant also noted that Plaintiff had

---

[17] Dr. Beyant did not note how many pounds Plaintiff could "frequently" lift.

22

not undergone an occupational examination to establish specific limitations regarding her environmental restrictions.[18]  *Id.*

### B.  Plaintiff's Testimony

Plaintiff was born on April 8, 1954,[19] and had not completed schooling beyond the first year of high school.  TR 61.

Plaintiff testified that the last time that she had "credible earnings" was in 1992.  TR 51. Plaintiff testified that her last job was with the United States Armed Forces in Europe, where she worked as a "CDC instructor/teacher directing child's play, etc. for the child's development center, Darmstock, Germany."  *Id.*  Plaintiff testified that she did not hold a rank of department Army civilian, but that she was a "dependant [*sic*]."  TR 52.  Plaintiff testified that her training for the job involved instruction about "how to detect abuse in a child," how to administer medicine to a child, "how to interact with the children," and how to generally keep a child "happy."  *Id.*  Plaintiff testified that she had to quit her job because she "started having spells of a lot of nervousness and stuff."  *Id.*

Plaintiff testified that she worked in the production department of a "luggage and handbags" store called LaSport Sack.  TR 53.  Plaintiff stated that, at this job, she had to "stuff papers down into the bags, hundreds and thousands of bags," and "lift up [big luggage] with my arms and fold it up ... zip all the zippers on it before I could send it off."  *Id.*  Plaintiff testified that she also worked at 3-D Manufacturing which entailed "stuffing paper into handbags ... by

---

[18] Dr. Beyant made additional handwritten notes, however, the notes are illegible.  TR 438.

[19] Plaintiff's date of birth was not mentioned at the hearing, but is stated on her DIB application (TR 113) and is reported throughout her medical records.

23

hand." TR 54.

Plaintiff testified that her husband was in the United States Army and worked as a "chaplain assistant" with the "159th Aviation." TR 55. Plaintiff testified that her husband was stationed at Fort Campbell after being stationed in Darmstock, Germany. TR 56. Plaintiff reported that her husband had been stationed in Korea the previous year and that she did not relocate with him. *Id.*

Plaintiff testified that she was treated by John Cheasty, a physician's assistant, for hair loss and depression. TR 57-58. When asked whether she had worsening symptoms when her husband was away, Plaintiff responded, "No, sir, it stayed with me all the time. It's been with me. It just don't let up. It just keeps getting worse and worse. Even whether he's there or gone away I hurt. And I get depressed." TR 58.

Plaintiff testified that Dr. Jerry Holland had been treating her for her mental problems. TR 59. Plaintiff stated that Dr. Holland gave her medication and talked to her about her condition, but that another counselor in his office counseled her for depression. *Id.* When asked about the accuracy of her "global assessment of functioning" score that Dr. Holland noted in his records, Plaintiff stated that Dr. Holland "didn't know anything about my medical records, and therefore, all he could do was just continue on with the medications I've got or if I need something stronger because I was having more panic attacks and stuff then he could increase my medicines." TR 60.

The ALJ noted that Dr. Holland diagnosed Plaintiff with Post Traumatic Stress Disorder, and asked Plaintiff what "sort of trauma or stress" was the basis for the diagnosis. TR 60. Plaintiff testified that the trauma resulted from an attempt to adopt a child, and that she "went into a real bad depression" when the adoption process failed. *Id.* Plaintiff testified that she

24

eventually had a natural-born child. *Id.* Plaintiff stated that she began to have "flashbacks" of her own childhood and things that had happened to her. *Id.* Plaintiff stated that when she heard her daughter "crying at her daddy when he was giving her baths and stuff," she would have flashbacks and begin to think "that he was hurting her, when it was me that was getting hurt when I was younger." TR 60-61.

Plaintiff testified that she had been having "a lot of tingling" in her legs; that her knees had "been giving way"; that her ankles and feet "give away"; and that she had fallen as a result. TR 62. Plaintiff testified that she had to visit a doctor "in June with a bad ankle" because she had fallen.[20] *Id.*

Plaintiff testified that she had not received, and did not expect to receive, any benefits from previous employers. TR 62.

Plaintiff testified that she had been diagnosed with "major depression"; she also stated that she "hurt all over." TR 62. Plaintiff stated that the doctors had told her that she "possibl[y]" had fibromyalgia, but that the doctors had also said that she had "myofacial pain syndrome and major depression." TR 63. Plaintiff testified that she began experiencing the symptoms of her illness in 1992, when she lost the use of her right arm while in Darmstock, and when she had fatigue at the child development center. *Id.* When asked whether her "problems" had become "better at any times or worse," Plaintiff responded, "No, it stays the same. They stay the same." *Id.*

When asked how her illness affected her so that she could not work, Plaintiff responded:

> It's hard for me to sit. It hurts way down in my back, my spine.
> When I lift my arms they ache and hurt in my shoulders, in my

---

[20] Presumably, Plaintiff was referring to June 2000.

25

> neck. I have a lot of muscle spasms. When I walk very much my
> bottom of my feet get real sore now. I hurt around the soles of my
> feet and in my knees some now. It's getting worse I can tell.

TR 64. Plaintiff testified that she had "been getting worse gradually, just on and on, and worse in the past," and that she had "good days and bad days." *Id.*

Plaintiff testified that she experienced headaches "usually at least three times a week," and that she also experienced "bad migraines." TR 64. To relieve her migraines, Plaintiff stated that she had to go to her bedroom, put a blanket over the window, and "have it real quiet." *Id.* When asked how long she stayed in her bedroom, Plaintiff responded, "Sometimes it's for hours." TR 65. Plaintiff testified that she took "Neurotin" and "Terazodone" to try and relieve her headaches. *Id.*

Plaintiff testified that she "continuously hurt," and she characterized her pain as an "eight out of ten" every day. TR 65. Plaintiff stated that she did not like to be around people because she did not know how she was going to start feeling. *Id.*

Plaintiff described her pain as "sharp in my back, but it's like a toothache." TR 66. She stated, "I feel like I've got the flu." *Id.* Plaintiff also stated that she had "real bad muscle spasms." *Id.* When asked if there were any activities that made the pain more severe, Plaintiff responded, "Yeah, I can't do anything ... I can't bend over to put the dishes in the dang dishwasher. It hurts." *Id.*

Plaintiff stated that she was taking Terazodone, Ativan, Effexor, Cyclobenzoprene, and "something with codeine in it," to help her pain. TR 67.

Plaintiff testified that, in 1992, she "got real depressed and started having to lay down a lot." TR 68. She stated that the "bad hurting come [*sic*] on a little later ... everything got worse over the time." *Id.* Plaintiff testified that she started having panic attacks in 1985, and that, at

26

the time of the hearing, she was having them "quite frequent[ly]." *Id.* Plaintiff reported that her doctors kept "trying different medicines to try to keep me from, you know, from going over the edge." *Id.* Plaintiff testified that she also had problems with dizzy spells. *Id.*

Plaintiff testified that she was limited in the use of her shoulders, arms, and hands; that she had been limited in this capacity since the time she was treated in Darmstock; and that this was the reason she had to stop working. TR 69. Plaintiff testified that she was not able to grip small objects, such as a pencil, because her wrist and her arms became "numb" and her fingers became "numb and tingly" so that she could not write. TR 70. Plaintiff testified that she had not been able to write since 1998, when her husband left for Korea. *Id.* Plaintiff stated that she lost the use of her right arm and had not been able to lift her arms at shoulder level since before she quit working at the child development center. *Id.*

When asked if she had trouble standing up, Plaintiff responded, "Yes, I have a lot of trouble standing up. It kills my back and my legs hurt. The back of my legs hurt." TR 71. Plaintiff testified that she had had trouble walking since 1996. *Id.* Plaintiff testified that she also had trouble bending or stooping because she experienced "sharp pains" in her back. TR 72.

Plaintiff testified that prior to 1993, when her daughter was born, she had attempted to adopt a child. TR 73. Plaintiff again testified that when the adoption failed, she experienced "a lot of depression," and that, when she had her own child, she began to experience "flashbacks" of her herself as a child which made her fear for the safety of her child. *Id.* Plaintiff testified that after the adoption failed, she experienced an "increased level of depression," which had affected her ability to have relationships with people, including her husband. TR 73-74. Plaintiff testified that she was under psychiatric treatment and taking medications. TR 74.

Plaintiff testified that she had a license to drive, but that she had difficulty driving. TR

27

74-75.  Plaintiff testified that she often became lost and drove around "in circles."  TR 75.  She

stated that she has had this problem since 1994 or 1995.  *Id.*

Plaintiff stated that she had problems with her vision and that she could not sleep through

an entire night.  TR 75.

### C.  Medical Expert Testimony

Medical Expert ("ME"), Dr. Norman Henry, also testified at Plaintiff's hearing.  TR 78-

87.

The ALJ addressed the ME:

> The three most important time periods I would say would be the
> onset date, January 1 of '92.  Then the next one that's cruicial
> would be date last insured, September 30th of 1997.  And if that has
> to be contrasted with any opinions with information after that date
> then that should be considered as well.  First of all, for the period
> of time during which the claimant might have been insured,
> leading up to September 30, 1997 I would draw inference [*sic*]
> U.S. Army records do [*sic*] have Darmstock treatment records.
> Did you receive --

TR 79.  The ME stated that he did not have the military records and that the earliest records he

received concerned treatment by Dr. Jacoby, dated August 22, 1997.  TR 79-80.

The ME testified that he possessed records from Dr. Swenson, who first saw Plaintiff in

September 1997, and a letter from Dr. Zengali that indicated that he also first saw Plaintiff in

September 1997.  TR 80.  The ME stated that Dr. Swenson's letter was "very positive" in terms

of Plaintiff's response to her treatment for depression.  TR 81.

The ALJ gave the ME Plaintiff's military medical records to review.  TR 81.  The ALJ

then asked if there was anything within the time period mentioned that was relevant to the case.

TR 82.

The ME testified that he "did read the word anxiety in a treatment record from June of

28

'91," but that it was not the primary complaint, and that the primary complaint in the record was for pain. TR 82. The ME testified that he "did not see depression" prior to the records that he had already been given. *Id.* The ME testified that he saw a record from Dr. Larson that mentioned "depression," which was dated 1998. *Id.* The ME stated that Dr. Larson's record discussed "depression" in present tense terms, and that it was difficult to discern the time-frame. *Id.* The ME testified that "depression" was mentioned "minimally" through August 1998. TR 83.

The ALJ asked the ME: "Is there any medically determinable psychological impairment in existence no later than September 30, 1997?" TR 84. The ME responded that there was a diagnosis that "appear[ed] to be legitimate, but ... there [was] not an impairment noted prior to that."[21] *Id.* The ME testified that there could be an "adjustment disorder with depressive features" which could be in the category of "depressive disorder NOS," effective no later than September 30, 1997. TR 85.

The ALJ asked the ME: "Is there any other medically determinable mental impairment in the period before October 1 of '97 that would meet ... the diagnostic requirements of the DSM-IV?" TR 85. The ME testified that Dr. Swenson had noted a "panic disorder" and "progress of marked reduction in panic attack symptoms." *Id.* The ME noted that, on August 22, 1997, it was mentioned that "anxiety" was present, but that there was no diagnosis of a panic disorder. TR 86. The ME testified that the anxiety mentioned was "exactly what mixed features adjustment disorders, 309.28 is ... [s]imply put, it's mixed emotional features that are depression and anxiety." TR 86.

---

[21] The "legitimate diagnosis" to which the ME refers is that of Post Traumatic Stress Disorder, diagnosed in March 1999. TR 84.

29

The ALJ asked the ME, "Taking that particular impairment [the adjustment disorder] as it exists then, no later than September 30, 1997, are you able to give your opinion as to the degree of limitation, if any, there would have been in functional activities?" TR 86. The ME testified that the "sparseness of the records" made it very difficult to ascertain Plaintiff's functional capabilities. *Id.* The ME testified that the "best" statement that he read was Dr. Swenson's statement of "outstanding progress with what is actually a small dosage of Zoloft." TR 87.

The ALJ asked the ME, taking into consideration Dr. Swenson's statement, "Would that information lead you to any conclusion as to whether or not the impairment would have been a severe one at that time?" TR 87. The ME testified that, given the data that he had received, he would not see Plaintiff's impairment as "severe" at that time. *Id.* He testified that there would be "slight" limitations. *Id.*

## D. Vocational Testimony

Vocational Expert ("VE"), Dr. John Grenfell, also testified at Plaintiff's hearing. TR 87-93. With regard to Plaintiff's past relevant work history, the VE stated that Plaintiff's work at the child development center, where she was an instructor and teacher, would be "classified as semi-skilled and light and would have an SVP of three." TR 88. He noted that, according to the record, Plaintiff had to lift between 10 and 20 pounds at the child development center. *Id.*

The VE testified that Plaintiff's work in the luggage factories as a "stuffer" was classified as "unskilled," considered to be "light" in nature, and had an "SVP of two." TR 88. The VE stated that Plaintiff's job stuffing luggage was likely "light" in nature, and her job stuffing handbags was likely "sedentary" in nature, and both were "unskilled." *Id.*

The ALJ stated that Plaintiff was a "younger individual," and that she had a "ninth or tenth grade education." TR 88.

30

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff, and asked the VE to consider all of the following vocational factors when responding to further questions: "non-severe mental impairment that would cause only slight limitations in the broad range of categories"; "myofacial complaints"; ability to "lift and carry, push and pull, 50 pounds occasionally and 25 frequently"; "limitations with regard to kneeling, stooping, crouching, crawling, and balancing that would reduce the abilities to occasional"; and no ability to climb. TR 89.

The ALJ asked if the limitations mentioned above would "lower the effective functional capacity" of the hypothetical individual to "light" work. TR 89. The VE replied, "No, not necessarily." *Id.* He added that, "it would be a limited number of medium jobs [*sic*] but not the full range." *Id.* The ALJ asked the VE whether an individual with such limitations could perform any of Plaintiff's past relevant work. TR 90. The VE testified that this individual could perform the work of a "stuffer" or the work of an "instructor and teacher in a child development center." *Id.*

The ALJ presented a second hypothetical to the VE. TR 90. The ALJ asked the VE to consider a hypothetical individual with the following abilities and limitations: "ability to lift and carry, push and pull, 20 pounds occasionally and 10 frequently"; "ability to be on one's feet for two hour periods consistently, and in repeated segments for a full work day"; ability to sit for "two hours continuously and in repeated segments for a full work day"; and ability to "frequently" perform postural positions of "kneeling, stooping, crouching, crawling, climbing, and balancing." *Id.*

The ALJ asked the VE whether an individual with the limitations presented in the second hypothetical would be able to perform any of Plaintiff's past relevant work. TR 90. The VE

testified that this individual would be able to perform Plaintiff's past relevant work. *Id.*

The ALJ then presented a third hypothetical to the VE. TR 90-91. The ALJ asked the VE to consider a hypothetical individual who had the "ability to lift and carry 25 pounds occasionally and 10 frequently"; who was "limited for pushing and pulling"; who could "be on their feet five minutes continuously" and "sit for only five minutes continuously"; and who "could never stoop, crouch, crawl, climb, or balance." TR 91. The ALJ further added that this person had "marked" difficulties with work stress and "moderate" difficulties with concentration, attention, interacting and relating with supervisors, being socially predictable, and being emotionally stable and reliable. *Id.*

The ALJ asked the VE whether the individual in the third hypothetical would be able to perform any of Plaintiffs's past relevant work. TR 91. The VE testified that an individual who had to "change position every five minutes ... would not be able to engage in any sustained work activity." *Id.*

The ALJ presented a fourth hypothetical to the VE. TR 91. The ALJ asked the VE to consider Plaintiff's testimony as to her limitations; specifically, the "onset of the severity of difficulty." *Id.* The ALJ asked the VE whether an individual with such limitations would be able perform any work at all. *Id.* The VE testified that such an individual "would not be able to engage in any sustained work activity." TR 92.

The ALJ mentioned that he was aware of a mental assessment by Ms. Teresa Davis, a licensed clinical social worker, that would render Plaintiff disabled. TR 92. The ALJ stated, however, that under section 20 CFR 404.1518 of the Social Security Regulations, a licensed clinical social worker was not a medical source, and thus, Ms. Davis' assessment could not be used as a medical source statement. *Id.*

32

### III.  CONCLUSIONS OF LAW

### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  If the Commissioner, however, did not consider the record as a whole, the Commissioner's conclusion is undermined.  *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence:

Case 3:02-cv-00028   Document 17   Filed 04/13/06   Page 33 of 49 PageID #: 33

(1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[22] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

---

[22]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

34

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6ᵗʰ Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6ᵗʰ Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and

35

nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B).

**C.  Plaintiff's Statement Of Errors**

Plaintiff essentially contends that the ALJ did not accord appropriate weight to the opinions of the treating physicians and psychologists; that the Secretary erroneously relied on the opinion of a non-examining psychologist medical expert regarding impairment severity; that the ALJ failed to follow the requirements of Social Security Ruling ("SSR") 83-20; that the ALJ wrongfully found that the Plaintiff's testimony was not fully credible; and that the ALJ failed to include the Plaintiff's mental and physical impairments during the questioning of the VE. Docket Entry Nos. 11 and 14.  Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed or, in the alternative, be remanded.  *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.  *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994).  *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

36

**1. Weight Accorded to Opinion of Plaintiff's Treating Physician and Psychologists**

Plaintiff maintains that the ALJ did not give appropriate weight to the opinions of the treating physician and psychologists. Docket Entry No. 11.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
>
> (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...
>
> (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
>
> (5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.
>
> ...

20 C.F.R. § 416.927(d) (emphasis added). *See also* 20 C.F.R. § 404.1527(d).

Case 3:02-cv-00028   Document 17   Filed 04/13/06   Page 37 of 49 PageID #: 37

Although Dr. Holland, Dr. Rutledge, and Dr. Zingale offer evidence that Plaintiff's disability may date back before the DLI, September 30, 1997, the record contains evidence that contradicts such a finding.

The ALJ noted that Plaintiff was seen for mild anxiousness and depressive complaints at the Blanchfield Army Hospital and the Army Hospital at Darmstadt, Germany from 1991 through 1994, but that there were no diagnostic criteria identified nor specific limitations identified. TR 25. The ALJ further noted that there were reports consistent with a panic disorder in September of 1997, however, there was no diagnosis of such a disorder. *Id.*

The ALJ gave credence to the reports offered by Dr. Jacobi. TR 25. The ALJ noted that a there was a showing of myofascial pain and that "no specific diagnosis was given" in the reports. *Id.*

The Court notes that Dr. Jacobi reported on September 22, 1997, that Plaintiff was to start taking Zoloft. TR 207. Subsequently, on October 1, 1997, Dr. Swenson noted that Plaintiff was "sleeping well." On October 29, 1997, Dr. Swenson noted Plaintiff's "outstanding progress" on a low dose of Zoloft. TR 206-207.

Additionally, the ALJ noted that the Disability Determination Service physicians and psychologists found Plaintiff capable of "light exertional level work on a sustained basis with no severe mental impairments at the time of the expiration of her date last insured." TR 25. The ALJ noted that the assessments were "consistent with the concurrent objective evidence of record and are deemed accurate of [Plaintiff's] true abilities [*sic*]." *Id.* Such evidence is inconsistent with the medical findings mentioned by Plaintiff. The ALJ adopted the "credible" assessments given by Disability Determination Service physicians. TR 26.

Furthermore, the ALJ considered the testimony of Dr. Norman Henry, the testifying medical expert. TR 26. The ALJ noted that the ME testified that "there was no evidence of any mental impairment which imposed more than minimal functional limitations prior to October 1, 1997." *Id.* The ALJ also noted that the ME's findings were in accord with the Disability Determination Service, and that he found their assessments credible. *Id.*

Finally, the ALJ considered the testimony of Dr. John Grenfell, the testifying vocational expert. TR 26. The ALJ noted that the VE testified that "based on [Plaintiff's] residual functional capacity, the claimant could return to her past relevant work as a child development center teacher, and a factor worker as performed by the claimant [*sic*]." *Id.*

As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.* When the opinions of treating physicians are inconsistent with each other, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2).

Plaintiff alleges that the ALJ's failure to mention the opinions of Drs. Holland, Rutledge, and Zingale was reversible error. Docket Entry No. 11. However, failure to mention or discuss the weight given to a physician's opinion is not necessarily reversible error. *Heston v. Commissioner*, 245 F.3d 528, 535 (6th Cir. 2001). In this case, the ALJ did in fact mention the opinions of Dr. Holland, although he did not mention Dr. Holland by name. TR 25. Dr. Holland and Dr. Rutledge did not treat plaintiff until after the expiration of Plaintiff's insured status. *See*

39

TR 333; 417-418; 428-431. As for Dr. Zingale, he did not submit any treatment notes. He provided only a one page letter, which makes the omission of discussion of his letter in the ALJ's opinion a "harmless," non-reversible error. TR 325; *Heston*, 245 F.3d at 535-536. Although Plaintiff argues that the Secretary's "salvation" in Heston was the fact that he incorporated the limitations set forth by the physician in his hypothetical question, the court in fact cited several reasons why the omission of the doctor's report from the written opinion was harmless error. Docket Entry No. 14; *Heston*, 245 F.3d at 535-536. As such, the Regulations do not mandate that the ALJ accord the evaluations by Dr. Holland, Dr. Rutledge, and Dr. Zingale as controlling weight. Accordingly, Plaintiff's argument fails.

## 2. Weight Accorded to the Opinion of a Non-Examining Psychologist Medical Expert

Plaintiff contends that the ALJ erroneously relied on the opinion of a non-examining psychologist medical expert regarding impairment severity by giving the opinion "great weight," when such opinion was not based on a review of the entire record in this case. Docket Entry No. 11.

Notwithstanding Plaintiff's claim that the Medical Expert "did not have time to review the military medical records before the hearing" (Docket Entry No. 11), the ALJ did not indicate how much weight he accorded the Medical Expert's testimony. The ALJ stated only that he found the ME's testimony "credible." TR 26. Plaintiff fails to cite conclusive support for her notion that the ALJ accorded the Medical Expert's opinion "great weight."

Regardless as to how much weight the ALJ accorded the ME's testimony, the ALJ did not base his decision solely on the ME's testimony. As noted above, the ALJ, in his decision, considered other evidence from the medical record.

40

The Regulations simply require that the ALJ state "the findings of fact and the reasons for the decision." 20 C.F.R. § 416.1453(a). As the Sixth Circuit has noted, "[t]o require a more elaborate articulation of the ALJ's thought processes would not be reasonable." *Gooch v. Secretary,* 833 F.2d 589, 592 (6th Cir. 1987). The ALJ complied with the regulation; he specifically articulated his findings of fact, and, using the information in the record, provided the rationale for his decision. TR 22-28. Accordingly, Plaintiff's argument fails.

### 3. Failure to Follow the Requirements of Social Security Ruling 83-20

Plaintiff maintains that the ALJ failed to follow the requirements of SSR 83-20, which deals with determining the onset date of disability. Docket Entry No. 11. As Plaintiff points out, SSR 83-20 contains relevant factors to be considered when determining an onset date. *Id.* Plaintiff also demonstrates evidence in the record that correlates with the requirements of SSR 83-20. *Id.*

As noted above, there is conflicting evidence in the medical records. Also as noted above, when the opinions of treating physicians are inconsistent with each other, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2). The ALJ considered the considered the medical records and hearing testimony and arrived at a decision adverse to the Plaintiff. TR 22-28.

In her brief, Plaintiff invites the Court to determine what date her disability began. Docket Entry No. 11, p. 2. It is not the position of this Court, however, to determine such a date. In the instant case, the ALJ's objective was to determine whether Plaintiff was disabled before her DLI. *See* 20 C.F.R. § 404.131; 42 U.S.C. §§ 423 (a) and (d). *See also* TR 23. The ALJ considered the medical records and the hearing testimony and decided that Plaintiff was not

41

disabled before her DLI.  TR 22-28.  Substantial evidence supports the ALJ's determination.

**4. Failure to Consider New and Material Evidence**

Plaintiff argues that a letter from Dr. Jerry Holland (TR 440), dated September 25, 2000, constitutes new and material evidence, and that the Appeals Council erred by choosing "not to remand or reverse despite this additional and extremely relevant evidence." Docket Entry No. 11.  In the letter, dated nearly one month after Plaintiff's hearing, Dr. Holland states that Plaintiff was first seen by him on March 28, 2000, at which time she was diagnosed with major depressive disorder, generalized anxiety disorder, and panic attacks with possible agoraphobia.  TR 440.  Dr. Holland proceeded to describe a number of traumatic experiences which had occurred early in Plaintiff's life.  *Id.*  Plaintiff particularly cites Dr. Holland's statement, "There is no doubt in my mind that her disabling psychiatric condition goes back at least to 1996 and probably somewhat further."  *Id.*

The regulations provide that where new and material evidence is submitted with the request for review, the entire record will be evaluated and review granted where the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence.  20 C.F.R. § 416.1470.  After reviewing Dr. Holland's letter and the record as a whole, the Appeals Council determined that there was no basis under the regulations for granting Plaintiff's review.  TR 7-8.  The Appeals Council explicitly stated that neither the contentions raised in Plaintiff's request for review, nor the additional evidence, provides a basis for changing the ALJ's decision.  *Id.*

Remand for consideration of new and material evidence is appropriate only when the claimant shows that: (1) new material evidence is available; *and* (2) there is good cause for the

42

failure to incorporate such evidence into the prior proceeding. *Willis v. Secretary*, 727 F.2d 551, 554 (6th Cir. 1984). Plaintiff can show neither.

As an initial matter, Plaintiff cannot establish that Dr. Holland's letter is material. "In order for the claimant to satisfy her burden of proof as to materiality, she must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Secretary*, 865 F.2d 709, 711 (6th Cir. 1988) (*citing Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)). Plaintiff has failed to satisfy this burden. Because Dr. Holland's letter contradicts other evidence offered in the medical records, there is no reasonable probability that the Secretary would have reached a different disposition of the disability claim. The record in the case at bar is replete with doctors' evaluations, medical assessments, test results, and the like, all of which constitute "substantial evidence" to support the conclusion reached.

As explained above, the ALJ's decision must be supported by "substantial evidence." "Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion" (*Her*, 203 F.3d at 389 (*citing Richardson*, 402 U.S. at 401)), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance" (*Bell*, 105 F.3d at 245 (*citing Consolidated Edison Co.,* 305 U.S. at 229)).

Even if Dr. Holland's letter had been part of the record before the ALJ, "substantial evidence" supports the ALJ's findings and inferences. The ALJ's decision demonstrates that he carefully considered the testimony of Plaintiff, Vocational Expert, Dr. John Grenfell, and Medical Expert, Dr. Norman Henry. The ALJ observed Plaintiff during her hearing, assessed the medical records, and reached a reasoned decision. Additionally, the Appeals Council reviewed

Dr. Holland's letter, as well as the record as a whole, and expressly determined that the information contained in Dr. Holland's letter did not warrant changing the ALJ's decision. TR 7-8. Thus, there is no "reasonable probability that the Secretary would have reached a different disposition of the disability claim" if Dr. Holland's letter had been part of the record before the ALJ.

Furthermore, Plaintiff does not articulate a reason for why this evidence was not in the record earlier.

## 5. Failure to Allow Plaintiff's Husband to Testify During the Hearing

Plaintiff states that the ALJ "failed to question Plaintiff's husband ... which would have provided a more complete record." Docket Entry No. 11. Plaintiff further maintains that the non-examining psychologist medical expert "needed the benefit of [the husband's] testimony and it was denied to him." *Id.*

Regarding whether Plaintiff's husband should have testified, the ALJ advised Plaintiff's attorney that if he could "bring forth any testimony important to this cases that wouldn't be redundant of what [Plaintiff] has already said, you should do that." TR 78. The ALJ also stated, "If you feel it would be redundant, repetitive, cumulative of what I've heard then, of course, you can still judge it but I doubt that it would have much value." *Id.* Plaintiff's attorney responded, "I don't feel the testimony offered to the husband would do anything other than reinforce the credibility of [Plaintiff's] testimony. I just don't." *Id.*

The hearing transcript appears to indicate that Plaintiff's attorney believed that the husband could not offer evidence that would not be "redundant" of Plaintiff's testimony. TR 78.

44

Plaintiff's attorney chose not to have the husband testify.[23]  *Id.*

**6.  Wrongful Finding that Plaintiff's Testimony was not Credible**

Plaintiff maintains that the ALJ wrongfully found that Plaintiff's testimony regarding

pain and mental impairments was not fully credible.  Docket Entry No. 11.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations

of pain:

> [Subjective allegations of disabling symptoms, including pain,
> cannot alone support a finding of disability...[There must be
> evidence of an underlying medical condition *and* (1) there must be
> objective medical evidence to confirm the severity of the alleged
> pain arising from the condition *or* (2) the objectively determined
> medical condition must be of a severity which can reasonably be
> expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d

Sess. 24) (emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your

pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*,

923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating

symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the

ALJ's personal observations, and the objective medical evidence contradict each other.").

Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a

debilitating degree that it prevents an individual from engaging in substantial gainful activity."

*Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

---

[23]The Court notes that the ALJ stated in the introduction of his decision (TR 22) that
Plaintiff's husband testified at the hearing, however, there is no indication from the hearing
transcript that the husband testified.

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

Regarding Plaintiff's complaints of pain and mental impairments, the ALJ noted that Plaintiff testified that she could not work during her alleged period of disability because of "unbearable pain and weakness in her arms, legs and back." TR 24. The ALJ noted that Plaintiff testified that she "couldn't walk, stand or sit for prolonged periods." *Id.* The ALJ noted that Plaintiff "reported anxiety and depression which prevented her from being able to concentrate or stay on job task." *Id.* The ALJ further noted that Plaintiff alleged a panic disorder. *Id.*

The ALJ also stated, "In addition to a lack of objective evidence and treatment, [Plaintiff's] activities of daily living prior to September 30, 1997, were inconsistent with her allegations of disability." TR 26. The ALJ stated, "[Plaintiff] has acknowledged numerous activities which are inconsistent with an inability to work." *Id.* Regarding Plaintiff's alleged

46

impairments and the impact on her ability to work, the ALJ opined:

> The claimant's statements concerning her impairments and their impact on her ability to work for the period prior to the expiration of her date last insured are not entirely credible in light of the medical history, the reports of treating and examining practitioners, the degree of medical treatment required and the claimant's own description of her activities and life style during that period. There really is an absence of significant mental examination and treatment before October 1, 1997.

TR 24.

As discussed in the above subsections, the ALJ articulated his findings regarding medical records, opinions, and assessments. In addition to his medical findings, the ALJ found that Plaintiff was able to take care of her own personal needs; was able to care for a small child; was able to complete household maintenance activities as she has reported a more recent decrease in her activities; did not make complaints to treating sources of an inability to perform her household activities prior to the expiration of her DLI; did not seek disability until nearly two years after the expiration of her insured status; and continued to do such activities after her alleged onset date including getting her daughter ready for school and driving an automobile regularly. TR 24. The ALJ recognized that Plaintiff had been determined to be disabled as of October 1, 1998 as a result of mental limitations, however, the ALJ determined that the objective and other evidence of record does not establish disability prior to the expiration of her DLI. TR 25.

As can be seen, the ALJ's decision specifically addressed in great detail not only the medical evidence, but also Plaintiff's testimony and her subjective claims, clearly indicating that these factors were considered. TR 22-28. It is clear from the ALJ's detailed articulated rationale that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on

medical findings that were inconsistent with Plaintiff's allegations. This is within the ALJ's province.

### 7.  Failure to Include Plaintiff's Impairments During Examination of the Vocational Expert

Plaintiff contends that the ALJ failed to include the Plaintiff's "mental and physical impairments in the question to the vocational expert." Furthermore, Plaintiff contends that "[t]he question to the vocational expert did not include a mental impairment as set forth by Dr. Zingale, Dr. Rutledge or Dr. Holland." Thus, Plaintiff contends that the ALJ's "hypothetical questions fails [*sic*]," and that this error is grounds for a remand. Docket Entry No. 14.

Regarding hypothetical questions posed by the ALJ, "[i]t is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Secretary*, 987 F.2d 1230, 1235 (6th Cir. 1993).

As noted above, the record contains conflicting medical evidence. The ALJ discussed the medical evidence in his decision and noted the evidence that he found to be credible. TR 22-28. The ALJ included the evidence he found credible, as well as Plaintiff's testimony and subjective complaints, in his hypothetical questions posed to the VE. TR 88-92. Because the ALJ incorporated  limitations that he found to be credible in his hypothetical questions, the ALJ did not err in posing his hypothetical questions to the VE.

### 8.  Sequential Evaluation by the ALJ

Plaintiff argues that the ALJ erred by ending his sequential evaluation of Plaintiff's case with the conclusion that Plaintiff could return to her past relevant work. Docket Entry No. 14. Plaintiff further contends that because the ALJ improperly found that Plaintiff's mental

impairments were not severe, the ALJ erred in this conclusion. *Id.*

As stated above, the ALJ's condition that Plaintiff's condition was not severe was not in error, and this conclusion is supported by substantial evidence. Therefore, the ALJ's sequential evaluation was proper.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Pleadings or Administrative Record be DENIED and Defendant's Motion for Judgment on the Administrative Record be GRANTED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge