IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION



| | |
|---|---|
| ANNA Y. SIMS, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 3:02-0028 |
| ) | Senior Judge Nixon |
| v. ) | Magistrate Judge Knowles |
| ) | |
| JO ANNE BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM ORDER

Pending before the Court is Plaintiff's and Defendant's Cross-Motions for Judgment on the Administrative Record (Doc. No. 11 and No. 13). Magistrate Judge Knowles has issued a Report and Recommendation ("Report") (Doc. No. 17), to which Plaintiff has filed objections (Doc. No. 18). Upon review of the Magistrate Judge's Report and for the reasons stated below, the Court ADOPTS the Magistrate Judge's Report in its entirety, GRANTS Defendant's Motion for Judgment Based upon the Administrative Record, and DENIES Plaintiff's Motion for Judgment on the Administrative Record.

### I. BACKGROUND

#### A. Procedural Background

Anna Sims ("Plaintiff") filed her application for Disability Insurance Benefits ("DIB") on February 10, 1999, alleging that she had been disabled since January 1, 1992 due to "cervical arthrosis, endometriosis, fibromyalgia, break of concentration, pain, insomnia, chronic widespread soft tissue pain, stiffness, chemical imbalances [and] abnormalities in physical function beyond control." (AR 113-115, 124.) Plaintiff's application was denied both initially

(AR 94-95) and upon reconsideration (AR 96-97). Plaintiff subsequently requested (AR 106) and received a hearing (AR 46-93). Plaintiff's hearing was conducted on August 31, 2000 by Administrative Law Judge ("ALJ") Raymond Gliva. (AR 46.) Plaintiff appeared and testified. (AR 46-93.) Vocational Expert, Dr. John Grenfell ("VE"), and Medical Expert, Dr. Norman Henry ("ME"), also appeared and testified. (Id.)

Plaintiff also filed an application for Supplemental Security Income ("SSI") benefits on February 10, 1999. On April 19, 1999, Plaintiff was awarded SSI benefits based upon a finding of disability due to mental limitations as of October 1, 1998. (AR 22, 25.) However, since Plaintiff was insured for disability benefits only through September 30, 1997, Plaintiff must establish disability on, or prior to, September 30, 1997. (AR 23.) See 20 C.F.R. § 404.131; 42 U.S.C. §§ 423(a) and (d).

On September 19, 2000, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations prior to the expiration of her date last insured ("DLI"). (AR 19-28.) Specifically, the ALJ made the following findings of fact:

(1) The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through September 30, 1997.

(2) The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

(3) The claimant's myofascial pain was a severe impairment on September 30, 1997, based upon the requirements in the Regulations (20 C.F.R. § 404.1521).

(4) This medically determinable impairment did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

(5) The undersigned finds the claimant's allegations regarding her limitations prior to her date last insured not totally credible for all the reasons set forth in the body of the decision.

2

| | |
|---|---|
| (6) | The undersigned has carefully considered all the medical opinions in the record regarding the severity of the claimant's impairment (20 C.F.R. § 404.1527). |
| (7) | The claimant had the residual functional capacity for light exertional level work with no severe mental limitations as is fully set out in the body of this decision |
| (8) | The claimant's past relevant work as a child development center teacher, and a factory worker did not require the performance of work-related activities precluded by her residual functional capacity (20 C.F.R. § 404.1565). |
| (9) | The claimant's medically determinable myofascial pain did not prevent the claimant from performing her past relevant work. |
| (10) | The claimant was not under a "disability" as defined in the Social Security Act, at any time prior to the expiration of her date last insured on September 30, 1997 (20 C.F.R. § 404.1520(e)). |

(AR 27.)

On September 28, 2000, Plaintiff filed a timely request for review of the hearing decision. On December 6, 2001, the Appeals Council issued a letter declining to review the case (AR 7-8), thereby, rendering the ALJ's decision the final decision of the Commissioner. This civil action was thereafter timely filed, and this Court has jurisdiction. 42 U.S.C. § 405(g).

**B.  Factual Background**

In Plaintiff's medical record, there are sparse notes of situational anxiety and depression in 1985 and again in 1989. (AR 446, 449.) A 1988 note indicated that Plaintiff reported having "recurrence of depression/anxiety," and that Plaintiff had "poor impulse control." (AR 451.)

On June 7, 1990 at the United States Army Health Clinic in Darmstadt, Germany, Plaintiff reported panic attacks and anxiety. (AR 269.) Plaintiff again reported panic attacks due to anxiety secondary to stress on January 8, 1991. (AR 259.) Plaintiff visited the US Army Health Clinic on March 18, 1991 and requested medication for her "nerves." (AR 257.) The physician noted that Plaintiff had "mild anxiety" and prescribed her Atarax 25 milligrams. (Id.)

Plaintiff returned to the Army Clinic on June 26, 1991 and reported some anxiety/nervousness. (AR 255.) Plaintiff was subsequently diagnosed with slight depression at the Family Practice Clinic in Fort Campbell, Kentucky in March of 1993. (AR 471.)

On July 1, 1997, Ms. Kitty Stephens, N.P., examined Plaintiff and noted that Plaintiff was "neurologically intact." (AR 473.) Plaintiff then visited Dr. Susan Jacobi on August 22, 1997 due to neck and shoulder pain. (AR 202.) Dr. Jacobi noted that Plaintiff was "distraught," and that much of Plaintiff's medical history had to be obtained from her husband. (Id.) Plaintiff reported some problems with fatigue and depression the previous year, but she began to "feel better about herself" after losing weight and exercising more. (Id.) However, Plaintiff reported that "excessive muscular pain and muscular spasms" had since returned in her upper back and neck. (Id.) Plaintiff had seen six to eight doctors regarding this pain, but never received a clear diagnosis. (AR 203.)

Dr. Jacobi noted that Plaintiff had "chronic neck and shoulder pain" and that the etiology had not been identified, but Dr. Jacobi was leaning towards a diagnosis of myofascial pain syndrome. (AR 204.) Dr. Jacobi also noted that Plaintiff had a "very strong component of depression and anxiety, [and that] [s]he is clearly upset and worked up over the whole situation, [which is probably] aggravating her underlying pain syndrome." (Id.) Dr. Jacobi stated that Plaintiff should "address the anxiety and depression and would benefit from seeing a psychiatrist and a counselor for help with relaxation techniques and stress management and chronic pain management techniques." (AR 204-05.) Dr. Jacobi recommended Plaintiff take amitriptyline, but thought Plaintiff might need to start with a more complicated regimen. (AR 205.)

On September 4, 1997, the military hospital referred Plaintiff to outpatient psychotherapy "in order to assist with resolution of anxiety disorder," but the "anxiety disorder" is listed

specifically as a "provisional diagnosis" only. (AR 216.) Plaintiff subsequently began treatment with a psychiatrist, Dr. Brian R. Swenson, on September 14, 1997. (AR 210.) Dr. Swenson noted that Plaintiff recently experienced a panic attack, and decided Plaintiff would remain on the medications Xanax and Paxil. (Id.) However, a few days later, on September 17, 1997, Dr. Swenson noted that Plaintiff discontinued her use of Paxil due to an adverse reaction. (AR 209.) The following day, Dr. Swenson noted that both he and Plaintiff's psychologist, Dr. Zingale, agreed that "there is a tremendous histrionic component to [Plaintiff's condition]." (AR 208.) Dr. Swenson also stated that "this is a somewhat puzzling woman who is clearly having panic attacks, although they seem to be in remission for last few days." (Id.) On September 22, 1997, Dr. Swenson noted that Plaintiff telephoned his office stating that she was having a panic attack, and that she would take Xanax and Zoloft. (AR 207.) In a handwritten notation dated October 1, 1997, Dr. Swenson indicated that Plaintiff telephoned his office to report that she was "sleeping well," and that she was "very pleased." (Id.)

During an examination on October 28, 1997, Dr. Swenson reported that Plaintiff was "clearly better." (AR 324.) In a letter dated October 29, 1997, Dr. Swenson reported to Dr. Jacobi that Plaintiff had made "outstanding progress." (AR 206.) Dr. Swenson noted that Plaintiff experienced "symptoms very consistent with Panic Disorder," but that she has "done beautifully" on a low dose of Zoloft (25 mg), and has had a "marked reduction in panic attack symptoms." (Id.) During an examination on December 2, 1997, Dr. Swenson reported that Plaintiff was "doing great," and later on January 20, 1998, he noted that Plaintiff was "doing well." (AR 324.)

On August 24, 1998, Plaintiff visited Dr. Richard D. Larson at Baptist Care for a complete examination. (AR 299.) Dr. Larson noted that Zoloft had helped Plaintiff's

depression, and that her depression was "under control." (Id.) On October 26, 1998, Plaintiff returned to Baptist Care and was examined by Dr. Ramsey G. Larson for a "bad sinus infection." (AR 291.) Dr. Larson noted that Plaintiff's depression was "mostly well-controlled" on Zoloft. (Id.)

In a letter dated March 6, 1999, Dr. Salvatore A. Zingale summarized his clinical contacts with Plaintiff. (AR 325.) Dr. Zingale indicated that he had seen Plaintiff for 15 sessions between September 11, 1997 and May 14, 1998. (Id.) Dr. Zingale wrote that Plaintiff sought treatment because she had experienced "moderate to severe pain in her neck and shoulder area (which was exacerbated by physical activity), frequent panic attacks, and depressed mood with insomnia, decreased energy level, increased appetite, irritability, decreased libido, anhedonia, and significantly decreased concentration and memory." (Id.) Dr. Zingale diagnosed Plaintiff with the following: "Panic Disorder without Agoraphobia; Depressive Disorder NOS; and Pain Disorder Associated with Psychological Factors." (Id.) Dr. Zingale noted that Plaintiff's treatment was "terminated prematurely" when she moved away. (Id.)

Medical Expert ("ME"), Dr. Norman Henry, also testified at Plantiff's hearing. (AR 78-87.) The ALJ asked the ME: "Is there any medically determinable psychological impairment in existence no later than September 30, 1997?" (AR 84.) The ME responded that there was a diagnosis that "appear[ed] to be legitimate, [which was Post Traumatic Stress Disorder,] but ... there [was] not an impairment noted prior to [September 30, 1997]." (Id.) The ME testified that Plaintiff could have an "adjustment disorder with depressive features" which could be in the category of "depressive disorder NOS," effective no later than September 30, 1997. (AR 85.)

The ALJ asked the ME: "Is there any other medically determinable mental impairment in the period before October 1, 1997 that would meet ... the diagnostic requirements of the DSM-

6

IV?" (Id.) The ME testified that Dr. Swenson noted "panic disorder" and "progress of marked reduction in panic attack symptoms." (Id.) The ME noted that, on August 22, 1997, there was a mention of "anxiety" present, but that there was no actual diagnosis of a panic disorder. (AR 86.) The ME responded that the "anxiety" mentioned was "exactly what mixed features adjustment disorder, 309.28 is . . . [s]imply put, it's mixed emotional features that are depression and anxiety." (AR 86.) Moreover, the ALJ asked the ME, "taking that particular impairment [the adjustment disorder] as it exists then, no later than September 30, 1997, are you able to give your opinion as to the degree of limitation, if any, there would have been in functional activities?" (AR 86.) The ME testified that the "sparseness of the records" made it very difficult to ascertain Plaintiff's functional capabilities. (Id.) The ME testified that the "best" statement he read was Dr. Swenson's statement of "outstanding progress with what is actually a small dosage of Zoloft." (AR 87.)

The ALJ then asked the ME, "Would that information lead you to any conclusion as to whether or not the impairment would have been a severe one at that time?" (Id.) The ME testified that, given the data that he received, he would not view Plaintiff's impairment as "severe" at that time, and that there would only be "slight" limitations. (Id.)

Vocational Expert ("VE"), Dr. John Grenfell, also testified at Plaintiff's hearing (AR 87-93.) With regard to Plaintiff's past relevant work history, the VE stated that Plaintiff's work at the child development center, where she was an instructor and teacher, would be "classified as semi-skilled and light and would have an SVP of three." (AR 88.) He noted that, according to the record, Plaintiff had to lift between 10 and 20 pounds at the child development center. (Id.) The VE further testified that Plaintiff's work in the luggage factories as a "stuffer" was classified as "unskilled," considered to be "light" in nature, and had an "SVP of two." (AR 88.) The VE

7

stated that Plaintiff's job stuffing luggage was likely "light" in nature, and her job stuffing handbags was likely "sedentary" in nature, and both were "unskilled." (Id.)

The ALJ stated that Plaintiff was a "younger individual," and that she had a "ninth or tenth grade education." (Id.) He then presented the VE with a hypothetical situation paralleling that of Plaintiff, and asked the VE to consider all of the following vocational factors when responding to further questions: "non-severe mental impairment that would cause only slight limitations in the broad range of categories"; "myofacial complaints"; ability to "lift and carry, push and pull, 50 pounds occasionally and 25 frequently"; "limitations with regard to kneeling, stooping, crouching, crawling, and balancing that would reduce the abilities to occasional"; and no ability to climb. (AR 89.)

The ALJ asked the VE if the aforementioned limitations would "lower the effective functional capacity" of the hypothetical individual to "light" work. (AR 89.) The VE replied, "No, not necessarily . . . it would be a limited number of medium jobs [sic] but not the full range." (Id.) The ALJ then asked the VE whether an individual with such limitations could perform any of Plaintiff's past relevant work. (AR 90.) The VE testified that this individual could perform the work of a "stuffer" or the work of an "instructor and teacher in a child development center." (Id.)

The ALJ presented a second hypothetical to the VE (AR 90.) He asked the VE to consider a hypothetical individual with the following abilities and limitations: "ability to lift and carry, push and pull 20 pounds occasionally and 10 frequently"; "ability to be on one's feet for two hour periods consistently and in repeated segments for a full work day"; ability to sit for "two hours continuously and in repeated segments for a full work day"; and ability to "frequently" perform postural positions of "kneeling, stooping, crouching, crawling, climbing

8

and balancing." (Id.) The ALJ asked the VE whether an individual with the limitations presented in the second hypothetical would be able to perform any of Plaintiff's past relevant work. (AR 90.) The VE testified that this individual would be able to perform Plaintiff's past relevant work. (Id.)

The ALJ then presented a third hypothetical to the VE. (AR 90-91.) He asked the VE to consider a hypothetical individual who had the "ability to lift and carry 25 pounds occasionally and 10 frequently"; who was "limited for pushing and pulling"; who could "be on their feet five minutes continuously" and "sit for only five minutes continuously"; and who "could never stoop, crouch, crawl, climb or balance." (AR 91.) The ALJ further added that this person had "marked" difficulties with work stress and "moderate" difficulties with concentration, attention, interacting and relating with supervisors, being socially predictable, and being emotionally stable and reliable. (Id.) The ALJ then asked the VE whether the individual, in this hypothetical, would be able to perform any of Plaintiff's past relevant work. (AR 91.) The VE testified that an individual who had to "change position every five minutes ... would not be able to engage in any sustained work activity." (Id.)

The ALJ presented a fourth hypothetical to the VE. (AR 91.) He asked the VE to consider Plaintiff's testimony as to her limitations; specifically, the "onset of the severity of difficulty." (Id.) The ALJ asked the VE whether an individual with such limitations would be able to perform any work at all. (Id.) The VE testified that such an individual "would not be able to engage in any sustained work activity." (AR 92.)

The ALJ found the Disability Determination Service ("DDS") physicians and psychologists' assessments to be credible since they were made after review of the objective evidence of record, and they are consistent with the concurrent objective evidence. (AR 25.)

9

One DDS physician determined that Plaintiff had "min[imum] to moderate limitations [and is] capable." (AR 336, 342.) Another stated that the evidence on record was minimal prior to the DLI and, thus, insufficient to diagnosis Plaintiff with a severe mental impairment during the relevant period. (See AR 345.) The 07/09/99 DDS assessment stated that Plaintiff "responded well to treatment and by 10-97 was seen as under . . . control." (AR 386.) This report further stated that the record was "technically insufficient" with respect to the intensity of her condition prior to the DLI. (Id.)

The ALJ mentioned that he was aware of a mental assessment by Ms. Teresa Davis, a licensed clinical social worker, that would render Plaintiff disabled. (Id.) The ALJ stated, however, that under section 20 CFR 404.1518 of the Social Security Regulations, a licensed clinical social worker was not a medical source, and thus, Ms. Davis' assessment could not be used as a medical source statement. (Id.)

## II. STANDARD OF REVIEW

The Court's review of the portions of the Report to which Plaintiff objects is de novo. 28 U.S.C. § 636(b). The Court's review is limited to "a determination of whether substantial evidence exists in the record to support the Secretary's decision and to a review for any legal errors." Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). Title II of the Social Security Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Accordingly, an ALJ's decision will be upheld if it is supported by substantial evidence. Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla of evidence, but less than a

10

preponderance." Bell v. Commissioner, 105 F.3d 244, 245 (6th Cir. 1996) (citing Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)).

Even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. Her v. Commissioner, 203 F.3d 388, 389 (6th Cir. 1999) (*citing* Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education and work experience. Miracle v. Celebrezze, 351 F.2d 361, 374 (6th Cir. 1965).

### III.   PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT

Plaintiff asserts that the ALJ has erred in not finding her to have a disability prior to the DLI. (Doc No. 11.) Specifically, Plaintiff argues that since the Social Security Administration ("SSA") found she was disabled due to "mental limitations" as of October 1, 1998, and a review of the medical proof does not reveal a dramatic change occurring between the period prior to the DLI and the disability determination date of October 1, 1998, then the medical proof demonstrates that she was "suffering from a mental impairment for some time." (Doc. No. 18.) The Court's role here is to determine if the ALJ based his decision of non-disability on substantial evidence. "In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985). The Court disagrees with Plaintiff's objection and concurs with the Magistrate Judge that there is substantial evidence in

11

the record to support the ALJ's finding that Plaintiff did not have a severe mental impairment prior to September 30, 1997.

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a prima facie case of disability.

> (5) Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920. *See also* Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

In this case, Plaintiff failed to meet her burden of establishing an inability to engage in substantial gainful activity due to a physical or mental impairment prior to the DLI. The ALJ noted that while Plaintiff's myofascial pain is "an impairment that is severe within the meaning of the Regulations, [it is] not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (AR 24.) Therefore, in order to establish a prima facie case of disability, Plaintiff needed to demonstrate that she was unable to return to work in light of her residual functional capacity. 20 C.F.R. §§ 404.1520, 416.920. Ultimately, the ALJ determined that Plaintiff could have returned to work during the period prior to the DLI. (AR 24-26.) The ALJ considered all evidence on the record, and correctly based his assessment on the objective medical evidence, medical opinions and Plaintiff's testimony. (Id.)

As the ALJ noted, the record contains limited material relevant to the period prior to September 30, 1997. For example, prior to 1997, the record demonstrates only that Plaintiff visited the hospital for the occasional "slight depression" or "mild anxiety." (AR 255-270, 446-473.) Moreover, it appears that some visits were actually due to situational anxiety, such as during the period of her father's sickness and death. (AR 446-449.) Plaintiff's more substantial

evidence of mental impairment prior to the DLI is found in Dr. Susan Jacobi's assessment, Dr. Salvatore Zingale's letter and Dr. Brian Swenson's notes. However, the combination of these is not enough to justify a reversal of the ALJ's decision, and an analysis of the statements of Drs. Jacobi, Zingale and Swenson demonstrates why the ALJ could not rely heavily on their conclusions.

### A. Dr. Jacobi's Assessment

Dr. Susan Jacobi's August 1997 assessment did not specify or confirm diagnoses of a severe impairment, and Plaintiff did not require any aggressive treatments. (AR 25.) For example, Dr. Jacobi recorded that diagnostic testing supported a finding of myofascial pain rather than fibromyalgia. (AR 204.) In her objections, Plaintiff argues that Dr. Jacobi's statement that "Plaintiff needed to address the anxiety and depression" demonstrates the existence of a mental impairment prior to the DLI. (Doc. No. 18.) However, this statement actually only demonstrates the possibility of one. Dr. Jacobi did not diagnose her with a mental disability. Rather, she noted certain symptoms that might be aggravating Plaintiff's physical problems and advised that Plaintiff address them. (AR 204-05.) Furthermore, Dr. Jacobi's written assessment indicates that the anxiety and depression could have been situational due to Plaintiff's frustration and stress over the absence of a clear diagnosis and prognosis for her physical pain, and not necessarily due to a long-term mental impairment or disability. (Id.) Contrary to Plaintiff's contention, Dr. Jacobi's assessment does not firmly establish a mental disability prior to the DLI.

### B. Dr. Zingale's Letter

Second, Plaintiff cites psychologist Salvatore Zingale's March 6, 1999 letter which stated that he saw Plaintiff sporadically for a total of fifteen sessions between September 11, 1997 and

14

May 14, 1998, and that Plaintiff met the diagnostic criteria for Panic Disorder without Agoraphobia, Depressive Disorder NOS and Pain Disorder Associated with Psychological Factors. (Doc. No. 18.) However, with regard to the evaluation of medical evidence, the Code of Federal Regulations states that "if [the SSA] find[s] that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [Plaintiff's] case record, the SSA will give it controlling weight." 20 C.F.R. § 416.927(d)(2). Dr. Zingale's assessment is not particularly valuable to Plaintiff's claim since, as the ALJ noted, Dr. Zingale's letter was not well-supported by any treatment notes, diagnostic criteria or other relevant medical evidence. (AR 325.) Therefore, the ALJ was correct in considering this piece of evidence in light of other medical expert's opinions.

Furthermore, as the regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead when there is contradictory evidence, the treating physician's opinion is weighted against it. (Id.) When the opinions of treating physicians are inconsistent with each other, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2). In this case, Dr. Zingale's letter largely contradicts the objective evidence available on record during the period prior to the DLI, as well as the ME, VE and DDS physicians' assessments. (AR 325.) Given that Dr. Zingale has not provided any medical evidence to support his opinion and diagnoses, the ALJ was correct in considering his assessment in light of the other medical experts' opinions.

Case 3:02-cv-00028   Document 19   Filed 06/30/06   Page 15 of 17 PageID #: 67

### C. Dr. Swenson's Letter

Finally, Plaintiff cites Dr. Brian Swenson's notes on September 14, 1997 stating that Plaintiff was "clearly having panic attacks." (Doc. No. 18.) While this statement indicates that Plaintiff reported symptoms consistent with a panic disorder in September 1997, there was no confirmed diagnosis of such. (AR 25, 208, 210.) Furthermore, these symptoms were "markedly reduced" with a low dose (25 mg) of anti-depressant/anxiety medications. (AR 26, 324.)

### D. Experts' Assessments

The ALJ adopted the assessments given by Disability Determination Service ("DDS") physicians who found Plaintiff "capable of light exertional level work on a sustained basis with no severe mental impairments at the time of the [DLI]." (AR 25-26.) The ALJ found the DDS physicians' assessments to be credible, particularly since "under 20 C.F.R. § 404.1527, program psychologists/physicians and medical experts are [considered] experts at disability evaluations." (AR 26.) The ALJ also found the DDS assessments to be consistent with the objective evidence of record. (Id.) The ALJ also considered the testimony of the ME. (Id.) He testified that, based on the data on record, he would not view Planitiff's impairment as "severe" during the period prior to the DLI since the data indicates she would only have had "slight" limitations. (AR 87.) The ALJ noted that the ME's assessment was in accordance with the DDS physicians' assessments. Next, the ALJ considered the testimony of the VE. (AR 26.) Based upon Plaintiff's residual functional capacity during the period prior to the DLI, he testified that Plaintiff could return to her past relevant work as a child development center teacher and a factory worker. (AR 26, 88-90.)

Finally, the ALJ determined that Plaintiff's daily activities prior to September 30, 1997 were inconsistent with an inability to work. (AR 26.) Specifically, Plaintiff was able to address

16

her own personal needs, take care of a small child, complete household maintenance activities, and drive an automobile prior to September 30, 1997. (Id.) She could still perform a majority of these activities after her alleged onset date, and did not seek disability until nearly two years after the DLI. (Id.)

The Court finds that Plaintiff did not have a disability within the meaning of the Social Security Act prior to the DLI, and thus affirms the ALJ's decision. It is clear from the Commissioner's report, the record and the hearing transcript that the ALJ considered all objective evidence of record, medical opinions and Plaintiff's testimony as required. As outlined by the Court, the ALJ's final determination that Plaintiff retained a sufficient residual functional capacity to return to work prior to the DLI is based on substantial evidence.

## IV. CONCLUSION

For the reasons stated above, the Court finds that the ALJ's decision was supported by substantial evidence and Plaintiff's objections are without merit. Consequently, the Court finds the Magistrate Judge's Report to be well-founded and supported by the record, and therefore, ADOPTS it in its entirety. Accordingly, Plaintiff's Motion for Summary Judgment is DENIED and the Defendant's Motion for Judgment Based Upon the Administrative Record is GRANTED.

It is so ORDERED,

Entered this the 30th day of June, 2006

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT